Filed 1/27/14  In re Ar. J. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re AR. J. et al., Persons Coming Under the Juvenile Court Law. | B249171 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROBERTA J.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK88159) |

APPEAL from an order of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Juvenile Court Referee.  Affirmed.

Anne E. Fragasso, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kim Nemoy, Senior Deputy County Counsel, for Plaintiff and Respondent.

_____

Roberta J. (Mother) has four children, A.S. (born 2002), Mario, (born 2003) Ar. J. (born 2006) and Au. J.(born 2009). All of them had different fathers, and none of the fathers are parties to this appeal. Mario lives out of state with his father and was not a party to these proceedings. Mother appeals from an order of the juvenile court on May 8, 2013, terminating her parental rights as to Ar. J. and Au. J. We affirm the order of the juvenile court.

*FACTUAL AND PROCEDURAL BACKGROUND*

The Los Angeles County Department of Children and Family Services (DCFS) filed a petition on June 7, 2011, pursuant to Welfare and Institutions Code section 300,[1] with respect to A.S., Ar. J. and Au. J., alleging that Mother had physically abused the children and medically neglected them (subds. (a) and (b)), failed to provide for them (subd. (g)) and placed their siblings at risk of physical abuse (subd. (j)). At the time, A.S. was nine, Ar. J. was five and Au. J. was 18 months old. Ar. J. had been diagnosed with ADHD. After DCFS unsuccessfully attempted to place the three girls together, A.S. and Ar. J. were placed in one foster home and Au. J. was placed in another.

An aunt and a godmother were investigated for placement.

On August 15, 2011, an adjudication hearing was held. The petition was amended and Mother waived trial rights and pled no contest to the amended petition. The court sustained the allegations as to subdivisions (b) and (g), as amended. The sustained allegations were that Mother had inappropriately disciplined the children by striking them; Mother had left them in the care of an unrelated adult during which time Ar. J. had sustained a burn to her chest; Mother uses marijuana which affects her ability to supervise and care for the children; Mother had been diagnosed with bi-polar disorder and depression but did not take her medication or maintain mental health management,

---

[1]     Further statutory references are to the Welfare and Institutions Code.

interfering with her ability to care for the children; and the children's fathers failed to provide for their daughters and their whereabouts were unknown.

A contested disposition hearing was set for October 11, 2011. During this time, Ar. J. was placed in three different homes. On September 12, 2011, she was placed in the licensed foster home of Felicia M.

Au. J. was placed in the home of Brenda D. on June 2, 2011. This was her only placement since detention. Brenda D.'s home was a two-bedroom, one-bathroom apartment. The social worker reported Au. J. had her own bedroom that was filled with age-appropriate furniture and toys. Everyone in the home spoke English and Brenda D. was observed to be attuned to Au. J.'s needs and wants while enforcing age appropriate rules and discipline. Brenda D. had an adult daughter who sometimes cared for Au. J.

On October 11th, maternal grandmother, Ellen M., filed a section 388 petition requesting legal guardianship of the children. On November 15th, the court denied the section 388 petition.

On February 3, 2012, the court held a disposition hearing. It ordered all three girls removed from Mother's custody. A.S. was released to her father's custody and jurisdiction as to her was terminated. The court ordered reunification services for Mother and monitored visitation, with no discretion to liberalize. A section 366.21, subdivision (e) hearing was set for September 6, 2012.

In August 2012, the social worker reported Ar. J. was doing well with her foster parent Felicia M. She was having difficulties in kindergarten but was now taking psychotropic medication and was receiving therapy. The caregiver was willing to become a legal guardian. Au. J. was also bonded with her foster parent, Brenda D. She called her "Aunty " or "Mommy." She was developmentally on target with no behavioral issues. Brenda D. was willing to adopt Au. J. Ar. J. did not visit with Au. J. because of Felicia M.'s work schedule.

Mother had not been in compliance with the case plan. She had not followed up with her mental health referral by failing to take prescribed medications. She was

3

disruptive during group counseling, so she was only enrolled in individual counseling but was not attending her scheduled sessions.

Mother was enrolled in random drug and alcohol testing but had 9 "no shows." She has submitted 10 urinalysis tests during 2012, all with negative results. Mother had been arrested three times during 2012. She was convicted of battery against a spouse or cohabitant. Mother had not been consistent with visits. At a birthday party for Ar. J., law enforcement arrived to arrest Mother. Au. J.'s foster mother reported that Mother slashed the tires of a woman who came to drop off a present for Ar. J. Ar. J.'s foster mother reported that Mother's visits went well and no behavioral problems were reported after the visits.

Mother was inconsistent with visits to Au. J. and rude to her foster mother. The foster family social worker observed a lack of attachment between Au. J. and Mother.

At the September 6, 2012 hearing, the court terminated reunification services for Mother and set a section 366.26 hearing for January 3, 2013. In January 2013, the social worker reported that Mother no longer visited the children but had called them sporadically.

At the January 3rd hearing, the court received the DCFS reports and ordered additional reports. That hearing was continued until May 6, 2013.

On April 3, 2013, the social worker wrote in a report that Ar. J.'s foster mother, Felicia M., had expressed her desire to maintain custody and follow through with the adoption home study process. The social worker gave her the home study packet and explained the home study process to her. Felicia M. is a divorced 47-year-old woman with two adult children who do not live in the home. She had been an employee of a nearby city for over 14 years. She had another foster child who did not wish to be adopted. Felicia M.'s 4-bedroom, 2-bathroom home was clean and nicely furnished, and the children had clean clothes and ample food. When the social worker was discussing the adoption home study process with Felicia, Ar. J. appeared attached to Felicia, and moved about the home freely. There were six previous referrals for Felicia M. as a foster parent, but all of them were determined to be either inconclusive or unfounded. Felicia

4

M. believed she had an approved home study on file with DCFS, and the social worker said she would request it.

A maternal great aunt, who was also a candidate for an adoptive parent, indicated she no longer desired to adopt Ar. J.

Brenda D. had another female foster child in addition to Au. J. She had an approved home study on file that was being updated for Au. J. The home was nicely furnished, child-friendly and had ample food supplies. Au. J. and the other foster child insisted on dressing alike, so Brenda D. purchased two of every clothing item for them. Brenda D. was also planning on adopting the other foster child. Brenda D. did not want to adopt Ar. J.

The social worker reported that Felicia M. and Brenda D. were working together to make sure Au. J. and Ar. J. had continued contact.

At the section 366.26 hearing which commenced on May 6, 2013, Mother testified. She said she visits Ar. J. on Sundays for approximately 2 hours and visits Au. J. on Fridays for approximately one hour. They both jump on her and ask her when they are coming home. She testified Au. J. asks about A.S. and Ar. J. and why they can't talk to their sister. Both try to follow her out at the end of the visits. Ar. J. "just wants to come home. She misses her sisters. She really doesn't understand why they're separated. So she cries. She calls me. She constantly cries." She also stated, Au. J. "just wants to come home. All she wants is her sisters. She doesn't understand why she has to realize that it's two mommies."

At the continued hearing on May 8, 2013, Ar. J., then seven years old, testified in chambers. The court commissioner and the children's counsel asked her several questions to determine whether she knew the difference between the truth and a lie. It was apparent from several questions, such as the color of her dress, Ar. J. could not distinguish between what was the truth and what was a lie. Upon questioning by Mother's counsel, Ar. J. said she last saw Mother when she was six years old, and talks to her on the phone. She asks Mother if she can call her sisters. When questioned, she said she would like to visit with her sisters and Mother more. She said she wanted to live with

her "foster auntie" until she sees her "real mom" and wishes she could live with Mother. She thought adoption was "fun." But when asked "And would you be sad if you couldn't see your mom anymore?" she said "I don't know." When asked if she would be sad if she couldn't see her sisters any more, she said "Nope."

The court found by clear and convincing evidence, that both Ar. J. and Au. J. were adoptable. It found it would be detrimental for the children to be returned to Mother. It did not find any exceptions to adoption applied. It found Mother had not maintained regular and consistent visits with the children nor was the relationship between Mother and the children such that it would outweigh the benefit to the children of stable and permanent homes. It stated, "And while the home studies are not completed, the Court doesn't see any impediments to the completion of those home studies and, therefore, no impediment to the adoptions. . . . [Ar. J.]'s testimony was actually very telling in regards to, frankly, her ambivalence in regards to visitation, or further visitation, and even in regards to the relationship of the siblings." It terminated Mother's parental rights and designated the girls' current caretakers as prospective adoptive parents. Mother filed an appeal from these orders.

Minute orders from the dependency court show that after the briefs were filed on appeal, the matter was called for a hearing on November 6, 2013 . The court found that the placement of Ar. J. and Au. J. was necessary and appropriate, the permanent plan of adoption and a specific goal of adoption were appropriate and ordered as a permanent plan, and the matter was continued until May 7, 2014, for a review of the permanent plan. DCFS was to ensure that regular sibling visitation would occur at least twice monthly.

*DISCUSSION*

*1. Sibling exception to Adoption*

Mother contends the juvenile court erred in finding the sibling relationship exception to adoption did not apply.

At a section 366.26 hearing, the court must select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) The

6

express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) Once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and the court then must concentrate its efforts "on the child's placement and well-being, rather than on a parent's challenge to a custody order." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) When the court finds by clear and convincing evidence the child is likely to be adopted, the statute requires the court to terminate parental rights unless the parent opposing termination can demonstrate one of six enumerated exceptions applies. (§ 366.26, subd. (c)(1)(B); *In re Matthew C.* (1993) 6 Cal.4th 386, 392.)

One of those exceptions is the sibling relationship exception, found in section 366.26, subdivision (c)(1)(B)(v). The purpose of the sibling exception is to preserve longstanding sibling relationships that serve as "anchors for dependent children whose lives are in turmoil." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 404.) "[T]he concern is the best interests of the child being considered for adoption, not the interests of that child's siblings." (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 822*; In re Celine R., supra*, 31 Cal.4th at pp. 49-50.)

A parent asserting the sibling exception bears the burden of demonstrating the existence of a strong sibling relationship, and showing its severance would be detrimental to the child for whom a permanent plan of adoption is being considered. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.)

Application of this exception requires a two-step analysis. First, the juvenile court must determine whether terminating parental rights would substantially interfere with a sibling relationship, evaluating the nature and extent of the relationship, including whether the children were raised in the same home, share significant common experiences, and have close and strong bonds. Second, if the court concludes termination of parental rights would substantially interfere with a sibling relationship, it must then weigh the child's interest in continuing the sibling relationship against the benefit the

7

child would gain from adoption. (§ 366.26, subd. (c)(1)(B)(v); *In re L. Y. L.*, *supra*, 101 Cal.App.4th at pp. 951-952.)

The mere existence of a positive sibling relationship does not trigger the exception. "Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*In re L. Y. L., supra*, 101 Cal.App.4th at p. 952.) The juvenile court must "balance the beneficial interest of the child in maintaining the sibling relationship, which might leave the child in a tenuous guardianship or foster home placement, against the sense of security and belonging adoption and a new home would confer. [Citation.]" (*Id.* at p. 951; see also *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1017, disapproved on another point in *In re S.B.* (2009) 46 Cal.4th 529.) Because adoption is the Legislature's strongly preferred permanent plan for children for whom reunification is no longer possible, the significant benefits of adoption may outweigh even a substantial detriment. (*In re Jacob S., supra,* 104 Cal.App.4th at p. 1018.)

On appeal, we review the factual decision of whether a significant sibling relationship exists for substantial evidence. The juvenile court's decision of whether termination of that relationship would be detrimental to the child is reviewed under the abuse of discretion standard. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622, citing *In re Bailey J*. (2010) 189 Cal.App.4th 1308, 1314-1315.)

The juvenile court found Ar. J. and Au. J. to be adoptable, and although the court concluded that a relationship existed among the children, the court concluded that the sibling exception did not apply.

Substantial evidence supports the juvenile court's determination that a significant sibling relationship did not exist. Prior to the filing of the petition, Ar. J. and Au. J. had only lived together for the first 18 months of Au. J.'s life. After the petition was filed, they were placed in separate homes and were separated for the next 23 months. Given their young age and the relatively brief period they lived together, Au. J. and Ar. J. did not have the type of relationship this exception was designed to protect. Despite

8

Mother's testimony, there was no evidence that the relationship between Ar. J. and Au. J. was particularly close or strong. Although Ar. J. testified she would like to visit her sisters more, she said she would not be sad if she could not see them.

Ar. J. and Au. J. had spent approximately two years in their foster homes, homes the social workers characterized as caring and appropriate. Felicia M. was equipped to handle Ar. J.'s special needs. Felicia M. and Brenda D., the prospective adoptive parents, reported a willingness to permit continued visitation with the siblings.

Even if we were to assume that the evidence was sufficient to establish a detriment to either girl from the termination of parental rights, the balance of the sibling relationship versus the benefits of adoption clearly tilts in favor of the adoptions. The girls had thrived for almost two years in the home of their foster mothers, who were prepared to adopt each of them. They attended to their medical, physical, emotional, and psychological needs. Failing to terminate parental rights would have deprived Au. J. and Ar. J. of the permanent homes that their caregivers were prepared to provide to them. Their immediate needs are stability and permanence. (See *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014 ["the application of [the sibling] exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount"].) We do not question the siblings' love for each other, young as they are, and assume their foster mothers will make every effort to maintain those relationships. Indeed, as the court recognized, both proposed placements have proved eager to maintain the children's connection with their siblings.

A closely bonded relationship between siblings may, in rare cases, constitute sufficient reason to preclude the termination of parental rights of an otherwise adoptable child. The evidence in the record does not show this is that rare case of a significant and strong sibling bond sufficient to defeat the termination of parental rights. Ar. J. has never spent any substantial period of her life living with Au. J. Mother has not demonstrated that the children shared significant common experiences or have close and strong bonds. While the minors have some connection and know of each other's existence, we are not convinced termination of parental rights will substantially interfere with these

9

relationships. Even if termination of parental rights will effect a change in the siblings' relationship, the juvenile court did not abuse its discretion in concluding that the benefits the children will surely reap in a secure, stable home with a loving and supportive adoptive family vastly outweigh maintaining a "legal" sibling relationship. The juvenile court properly concluded the sibling relationship exception did not apply.

### 2. *Absence of Completed Home Studies*

Mother contends the court should not have terminated her parental rights before the adoptive home studies had been completed.

A court may terminate parental rights even if an adoption home study has not been completed. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 166.) Section 366.26, subdivision (c)(1) provides in pertinent part: "The fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."

At this hearing, the question the juvenile court had to determine was whether the girls were likely to be adopted within a reasonable time. The question of whether the adoptive parents were suitable is left for the subsequent adoption proceeding. (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) In addition, the court had before it the social worker's report indicating that both foster mothers had completed prior home studies and both had other foster children. The observations of the social worker about the homes also indicated that nothing was amiss but the prior home studies would be verified.

Mother relies on *In re Salvador M.* (2005) 133 Cal.App.4th 1415. In *Salvador M.,* the home study had not been completed at the time of the section 366.26 hearing but had been completed by the time the case was considered on appeal. The issue regarding the home study thus became moot. (*Id.* at p. 1422.) While the *Salvador M.* court stated in dicta that it would have been better procedure to have continued the hearing until the home study was approved, it did not hold that a juvenile court abuses its discretion when it refuses to continue a section 366.26 hearing to permit an adoption home study to be completed. (*Ibid.*)

On these facts, the court was not required to have completed home studies before making its order.

## *DISPOSITION*

The order of the juvenile court terminating Mother's parental rights as to Ar. J. and Au. J. is affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**ZELON, J.**

11